## Case No. 11,815.

### RIDGEWAY v. UNDERWOOD.

[4 Wash. C. C. 129.] [1]

Circuit Court, D. New Jersey. Oct. Term, 1821.

LOTTERIES — LAND CONVEYANCE — FRAUDULENT CONVEYANCES—PURCHASER—CREDITOR —CONSIDERATION.

1. A conveyance of land lying in New Jersey, founded on a lottery consideration, is void by the lottery act of that state, although the lottery was contrived and drawn in Pennsylvania.

[Cited in Spindler v. Atkinson, 3 Md. 418, 423; Swain v. Russell, 10 Ind. 441.]

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

2. A purchaser for a valuable consideration, though with notice of a prior voluntary conveyance, is protected against it by the statute of 27 Eliz.

[Cited in Claflin v. Mees, 30 N. J. Eq. 212; Hagerman v. Buchanan, 45 N. J. Eq. 297, 17 Atl. 946; Lockhard v. Beckley, 10 W. Va. 106; Payne v. Stanton, 59 Mo. 160; Young v. Heermans, 66 N. Y. 381.]

3. A purchaser under a judgment and execution against the grantor in the voluntary settlement, cannot be considered as a purchaser protected by the statute of Elizabeth. But he is a creditor within the meaning of the statute, and stands in the place of the judgment creditor.

[Cited in Beeckman v. Montgomery, 1 McCart (14 N. J. Eq.) 111; Choteau v. Jones, 11 Ill. 322; Houston v. Blackman. 66 Ala. 559; Hunters v. Waite, 3 Grat. 56; Redfield v. Buck, 35 Conn. 338; Scott v. Purcell, 7 Blackf. 68; Shaffer v. Fetty, 30 W. Va. 264, 4 S. E. 287.]

4. Construction of the statute of Elizabeth as to fraudulent conveyances, in respect to prior and subsequent creditors, and subsequent purchasers.

[Cited in Hunters v. Waite, 3 Grat. 64; Weaver v. Owens (Or.) 18 Pac. 588.]

[5. Cited in Allaire v. Day, 30 N. J. Eq. 236, and Waln v. Waln, 53 N. J. Law, 434, 22 Atl. 205; and cited in brief in Shontz v. Brown, 27 Pa. St. 127. to the point that the rule that evidence is not admissible to show a consideration different from that recited in the deed, in order to defeat the effect and operation of the deed itself, has never been extended to prevent a party from showing that the deed is void for fraud or illegality.]

This was an ejectment brought [by Jacob Ridgeway against Jacob G. Underwood] to recover a tract of land called the lower or Griffith farm, containing one hundred and seventy-seven acres; and the cause came before the court for judgment, upon a case agreed, with liberty to either party to turn it into a special verdict. The facts stated in the case, and which are material to notice, are the following:

Joseph Jones being, in February, 1814, seised of a tract of land, lying in the state of New Jersey, called the Griffith farm, containing three hundred and eighty acres, of which the premises in dispute are a part, caused the same, together with other tracts of land lying in this state, of which he was seised in fee, preparatory to a disposition thereof, in the way and manner after mentioned, to be surveyed and divided into a number of lots, as delineated upon a certain map made by Samuel Lewis. These lots were of different values, many of the small ones being of little or no value, and none of them worth more than $5. He afterwards caused certificates to be printed, dated "Philadelphia. —— March, 1814," and numbered from 1 to 1501, the form of all of them being the same, except the number and name of the purchaser. These certificates were sold by Jones for $125 each. The certificate stated, that the person named in it was "the actual bona fide purchaser of one of the following pieces or parcels of property, viz. the Olympic theatre in Philadelphia; or Jones's island in the river Delaware; or a certain house in Walnut street, Philadelphia (describing it); or one of thirteen hundred and sixty-eight lots in the town of Norris; or of the plantation called the Griffith farm, containing one hundred and seventy-seven acres;" and so of a variety of other lands lying within this state, separately described under the disjunctive or. The certificate then concludes in the following manner— "whichever may be determined at the general division of the said property to be made under the special direction of John Geyer" (and three other persons by name), "and for whatever part of the property aforesaid this certificate may then become entitled to under the aforesaid division, I hereby bind myself, my heirs, &c. for and in consideration of $125 to me paid, to cause a good and sufficient deed to be made to the said purchaser, his heirs, &c. on the delivery of which, this certificate is to be returned to me." Signed, J. Jones. The case proceeds to state, that Jones, at the time these certificates were dated and sold, valued the several pieces of property enumerated in them at various prices, from $50,000 to $20. On the 18th of May, 1814, Jones and wife conveyed all the property mentioned in the said certificates to Robert Caldcleugh and two others in trust, after a general division of the said property shall be made under the special direction of the four persons mentioned in the certificates, among the several persons who have and shall become purchasers thereof from the said Jones, and upon the said Jones furnishing to them satisfactory evidence that he has discharged all the incumbrances upon the said estates (the amount of which several incumbrances are particularly stated) to reconvey all the above property to the said Jones in fee, in trust, and to the intent that Jones should convey to each of the said purchasers in fee simple, all that portion of the said estate in severalty which shall be allotted to him by the general division aforesaid, as the same shall be certified to the said Caldcleugh and his co-trustees, under the hands of the said John Geyer, &c. On the 29th of July, in the same year, Geyer and his associates, "in pursuance of the stipulation contained in the said certificates to determine the lot to which the holder of each certificate should be entitled, proceeded as follows:"— the case then proceeds to describe the drawing in the manner that lotteries are usually conducted, the tickets or numbers from 1 to 1,501 being drawn from one wheel, and the tickets containing the number of the lot, from 1 to 1,501, being drawn from the other, as the one to which the owner of the certificate, then unknown, was entitled. After the drawing was completed, the managers, Geyer, &c. made a return of their proceedings to the trustees before mentioned, stating the particular piece of property to which each holder of the certificates was entitled, under and by virtue of the said drawing. On the

12th of December, 1814, the trustees re-conveyed to Jones all the lands which he had conveyed to them, subject to the trusts described in the last mentioned deed. Jones, in execution of the said trust, conveyed by deed bearing date the 13th of December, 1814, to Jacob Sperry and his heirs, the premises in question, the said Sperry being the owner of the certificate which drew lot No. 1,487, called the Griffith farm; and the grantee took possession thereof. This deed recites the conveyance to Caldcleugh, &c. of the 18th of May, and that a general division had been effected of the property therein mentioned, by which the said Sperry, as owner of certificate No. 1,487, became entitled to the Griffith farm, containing one hundred and seventy-seven acres. It also recites the re-conveyance by Caldcleugh and others to the said Jones. On the same day, the 13th of December, 1814, Jones and wife, for the consideration of one dollar, executed a deed of release to the said Sperry and his heirs, of all their right, interest and estate 'n the aforesaid lower, or Griffith farm, by certain metes and bounds. On the 24th of February, 1816, Sperry, by deed, conveyed to B. Howell in fee in consideration of $12,630, the aforesaid tract of land; and on the 19th of March, 1816, Jones, for the consideration of $10, released to Howell and his heirs, all his right, interest and estate in the same. On the 13th of September, 1816, Howell conveyed the land to Lewis, in trust to sell the same for the payment of his debts; and in December, 1817, Howell and the trustee conveyed the same estate to Ogden, Rowland, and Segur, in fee, in consideration of $12,000. The grantees took possession under this deed, and the defendant held possession of the same as their tenant, when the declaration in ejectment was served.

The case further states, that two judgments were entered in the supreme court of this state, in February, 1818, in the name of Charles Holland, against the aforesaid Jones, upon two bonds dated in November, 1815, and January, 1816, one of them for the sum of $23,226, and the other for $12,000. That executions were issued on the said judgments, and delivered to the sheriff on the 25th of March following, by virtue of which, the premises in question were levied upon and sold by the sheriff on the 1st of June, 1818, to the lessor of the plaintiff; and that the sheriff, by deed dated the 16th of that month, conveyed the same to the purchaser. It is further stated, that before and at the time of the said sale and conveyance by the sheriff, Ogden gave public notice of the title of himself, Rowland and Segur to this land, and that they were then in possession, which notice was given in the hearing of the lessor of the plaintiff. That Charles Holland, the witness to the deeds to Sperry, is the same person who obtained the aforesaid judgments; and that the said Jones, the trustees in the deed of the 18th of May, 1814,

Sperry, Howell, Lewis, Rowland and Segur, and the managers mentioned in the aforesaid certificates, were all citizens of Pennsylvania, at and after the time of executing the aforesaid deeds. That the drawing of the numbers aforesaid, making the certificates, and all the transactions alleged to be a lottery, except the sale of some of the certificates, which was made in New Jersey, were done in the state of Pennsylvania. The case further states, that Sperry, Howell, Lewis, Ogden, Rowland and Segur, at the time of the deeds to them respectively made, had full knowledge of the proceedings relative to the aforesaid lottery, as alleged by the plaintiff.

Ewing and Richard Stockton, for the lessor of the plaintiff, contended: (1) That this was a lottery transaction, and that the deed from Jones to Sperry, founded upon that consideration, was void by the act of this state passed in the year 1797. Patt. Laws, 227. (2) That the release from Jones to Sperry, on the same day that the original conveyance of this land was made, was also void, being evidently a part of the same transaction, and merely intended as a further assurance devised for confirming a rotten and defective title. (3) That the different releases stated in the case, were void under the law of this state, which corresponds with the statutes of 13 and 27 Eliz. being for a nominal consideration, and therefore fraudulent as to creditors and subsequent purchasers. 2 Burrows, 1077; 3 Cruise, Dig. 374, 376; 1 Ves. Jr. 92; 9 East, 59; 2 Vern. 121; Gooch's Case, 5 Rep. [Coke] 61. The purchaser at the sheriff's sale is protected by the statute. 2 Johns. Ch. 49.

Griffith & Cox, for the defendant, insisted: (1) That this was not a lottery transaction; and that if it was, still the same having taken place out of this state, it is not embraced by the lottery act relied upon by the plaintiff's counsel. (2) That the release to Sperry operates as a deed of bargain and sale to pass an estate, by the law of this state, and being made for a valuable consideration, it is valid, since the court, upon this case, cannot presume that it is a part of the lottery transaction, or was founded on that consideration. But even if this were so, the subsequent release to Howell is free from any such imputation, and consequently the title of Jones was conveyed out of him before Holland's execution was levied. (3) The plaintiff cannot be considered as a purchaser within the state, as he did not buy from Jones; and if he had done so, still having been a purchaser with notice, he is not protected by the statute. As a creditor, he is not protected, as the case does not state that Jones was insolvent, or even embarrassed, when he released, either to Sperry or to Howell. Roberts, Frauds, 30, 40, 41; Cowp. 434, 435, 708. But though the deed to Howell was within the statute, it would not affect the defendant, who purchased bona

fide from Lewis, who had not notice. Sugd. Powers, 519, 520; 4 Wheat. 487.

The case was argued at the last term, and was taken under advisement until the present.

Before WASHINGTON, Circuit Justice, and PENNINGTON, District Judge.

PENNINGTON, District Judge. I consider all the transactions respecting the distribution of the different lots of land and real property to the holders of certificates, from the beginning down to the deed from Jones to the holders of certificates, and including that deed, as a lottery transaction; and that the plan being contrived, and executed in Pennsylvania, makes no difference, so far as it respects the land embraced by it lying in New Jersey; and this, whether the laws of Pennsylvania were violated or not. The transaction was not only against the policy, but the express prohibitions of the statute of New Jersey; and if an action were brought in either of the courts of this state, to enforce the fulfilment of any contract made under these transactions, it would not be sustained. It might be necessary to consider how far the courts of New Jersey would sustain an action founded on a disaffirmance of such contract, if another view of the subject did not render this unnecessary. I consider the lottery transaction as at an end with the deed from Jones to Sperry, made in conformity with the scheme. This was all that was stipulated to be done by Jones; and he was under no agreement to do more. Admitting that all this transaction was unlawful and void, the title still remained in Jones, and I have not been able to perceive any objection to his conveying the land, as was done by him and his wife, to Sperry. It is said to be all one transaction, and tainted with the original malady. But although the state of the case may excite suspicion, it will not, in my opinion, warrant the conclusion. It is also said that the consideration being nominal, the deed must be taken as voluntary, and therefore void against creditors.

As to the point that a deed with a consideration merely nominal, will, as it respects creditors, be treated as voluntary, it will not, I believe, be denied; but to render a deed void under the statute of Elizabeth, as respects creditors, it must be made with intent to defraud and delay creditors; and there is nothing in the case agreed to show that Jones was indebted at the time the deed was executed in 1814. The first bond was given in November, 1815, and the second in the January following. This is the only evidence that Jones was indebted at the time of executing the deed in 1814. I am, upon the whole, of opinion that judgment, as in case of nonsuit, ought to be entered.

WASHINGTON, Circuit Justice. This case presents three questions for the consideration of the court: (1) Was the first conveyance of the 15th December, 1814, by Jones and wife to Jacob Sperry, made in pursuance of a lottery transaction? If it was, then, (2) Is the case embraced by the law of New Jersey of the 13th February, 1797? If the answer be in the affirmative, then, (3) Did the estate of Jones pass from him by force of his subsequent deeds, or either of them?

1. That the transaction which gave occasion to this conveyance was a lottery, can scarcely admit of a doubt. There was a scheme published, by which the distribution of prizes was to be regulated; certificates, or tickets, were issued and sold; managers were appointed; wheels used for the purpose of distributing the prizes; and chance alone decided the value of the prizes to which the adventurers should respectively be entitled. Although, nominally, there were no blanks, inasmuch as some property was allotted to satisfy each certificate; yet, comparing the relative value of the different portions of the property with each other, and with the price paid for the certificates, there were in reality but few prizes, and all besides were blanks. For the case states that the price paid for the certificate, according to the scheme, was $125; that the property was valued by Jones at from $50,000 to $20, and that many of the small lots were of little or no value, and none of them worth more than $5. Upon chance, then, and that alone, could the purchaser rest his hope, whether he should, for his $125, gain property greatly exceeding that sum in value, or lose the consideration paid for his certificate, by obtaining property comparatively of no value. Every feature of this transaction then marks it as an ordinary lottery, except that the prizes were to be satisfied by land instead of money.

2. The next question is, whether the case is embraced by the law of New Jersey of the 15th of February, 1797? The first section of this act, which is entitled "An act for suppressing of lotteries," declares them to be common nuisances, and certain courts are directed to take cognizance of such offences. The second section forbids the erecting or drawing of any lottery within the state of New Jersey, under a certain penalty, to be recovered and distributed in the usual way. These sections are strictly local, and would have been so, although the restrictive words in the second section had been omitted; since the criminal laws of one country are never presumed to be intended to reach offences prohibited by them, when committed in any other; although the offender should afterwards be found within the jurisdiction of the former. The third section is local as to the offence which it describes and prohibits; and is in part extra-territorial, as to the subject to which the offence refers. It forbids, and punishes, the selling and the purchasing of tickets in any lottery, whether

erected in this state, or elsewhere; and although the offence is not confined by express terms to this state, yet, for the reason before mentioned, it ought to be so construed. The fourth section upon which the question arises, declares, "that every conveyance or transfer of any goods or chattels, lands or real estate, which shall be made in pursuance of any such lottery, shall be invalid and void."

The plaintiff's counsel contend that this section refers to lotteries erected in this state, or elsewhere, spoken of in the next preceding section. On the other side, it is insisted that it is confined to lotteries set up in this state, which are prohibited by the second section. The interpretation given by the plaintiff's counsel is, in my opinion, the correct one; it is most consistent with grammatical construction, as well as with the apparent intention and policy of the law. The relative ought always to find its antecedent as near as possible to itself, unless the obvious meaning of the instrument requires a more remote search to be made. The lottery last spoken of is one erected in the state of New Jersey, or elsewhere, to which the relative such ought to refer for its antecedent, according to the strict rules of construction. That the policy of the law does not require a violation of this rule, is to my mind perfectly obvious. The legislature clearly intended to suppress this species of gambling, to the utmost extent of their legitimate authority. It is first condemned as a common nuisance, and is made a public offence. As such, it is punished by severe penalties, imposed in a way, best calculated, as was supposed, to suppress the evil. To effect this object, it was deemed necessary to forbid, not only the erecting and drawing of lotteries, but the sale and disposition of the tickets, without which no lottery could be drawn. The former could not, with any propriety, be prohibited beyond the territorial jurisdiction of the state, and consequently, a pecuniary or personal punishment could not be consistently imposed. But so far as the law could indirectly and legitimately act, to prevent or to defeat the evil complained of, wherever the transaction might take place, is attempted in express terms by the third section, and by fair construction in the fourth. It was perfectly competent to the legislature to forbid the sale of tickets in this state connected with any foreign lottery, and so to regulate the conveyances of lands lying within this state, as to make void such as were founded upon a lottery transaction, wherever the tickets may have been sold. To have prohibited the sale of such tickets, avowedly for the purpose of defeating (as far as the prohibition could have the effect) the drawing of the lottery, and yet to suffer lands lying in this state, the fruits of the lottery, to pass to, and to be enjoyed by those who were adventurers in it, would have been a very imperfect course of legislation; and would but in part only have fulfilled the declared object of the law to suppress lotteries.

3. The last subject of inquiry is, did the deeds of release from Jones, or either of them, pass an estate to the releasee? or, in other words, is it competent to the purchaser, under the judgment and execution, to impeach them, on the ground of their being voluntary? It is contended by the plaintiff's counsel, that the consideration of one or of ten dollars, for property which had not long before been sold for $12,630, is merely nominal; and that the deeds are consequently voluntary, and fraudulent as to creditors and subsequent purchasers. To this it is answered, that the lessor of the plaintiff was a purchaser with notice; and that whether he was so or not, still he is not protected by the act of this state, which corresponds with the statutes of 13 and 27 Eliz.; he being a purchaser, not under Jones, the grantor, but under the sheriff, in virtue of an execution.

I have examined, with great attention, the various and contradictory decisions of the courts of law and equity, upon the construction of the above statutes. It is not my intention to prolong this opinion, by taking a particular review of those cases, which has been ably done by other judges; but being perfectly satisfied with the result to which my mind has arrived, I shall content myself with stating my unhesitating opinion upon the points which arise in the present case. Let it be admitted, for the sake of getting at once at the argument, that the release to Sperry may, upon the facts stated in the case, be considered as voluntary, on the ground of the consideration being altogether inadequate to the value of the property. It was, nevertheless, sufficient to pass the estate to the releasee, and to defeat the claim of the grantor to a resulting trust. But in a case where the rights of creditors or of a subsequent purchaser intervene, the deed may be impeached by them upon the ground of fraud, unless the grantee can show, as he is permitted to do, that the real consideration was such as to repel a presumption of fraud, arising from the circumstance of its inadequacy. If the lessor of the plaintiff could be considered as a purchaser, within the meaning of the statute of 27 Eliz., I should feel no hesitation in deciding that he would not be affected by notice of the deed to Sperry or to Howell, as I consider the law to be at length settled, that a purchaser for valuable consideration, with notice of a prior voluntary conveyance, is protected by the above statute. I must at the same time, acknowledge, that in giving this opinion, I yield to the weight of authority, rather than to the reasons upon which the decisions have proceeded. The reasons upon this point are collected, and ably reviewed by Lord Ellenborough in Otley v. Manning, 9 East. 59. But I cannot consider the lessor of the plain-

tiff as a purchaser, within the meaning of the 27 Eliz., as he derives his title to the land in controversy, not under Jones, but under a judgment and execution against the grantor in the voluntary deed, and a conveyance by the sheriff. He is nevertheless protected by the statute of 13 Eliz., because he stands in the place of the creditor under whose judgment and execution he purchased. This subject is well considered by Chancellor Kent, in the case of Hildreth v. Sands, 2 Johns. Ch. 35; and I entirely concur in the opinion there pronounced. The chancellor observes, "that when the statute gives the principal remedy, it gives also the incident. If it protects the creditor, it must protect his sale, and the purchaser under his judgment. On any other construction the creditor would be deprived of the fruit of his judgment. The purchaser under the judgment and execution is entitled to all the relief to which the creditor would have been; for he stands in his place, and is armed with his rights." The learned judge refers to a case in Latch. 222, which strongly supports the principle upon which his opinion is founded.

Considering the lessor of the plaintiff then as a creditor, he must also be treated as one subsequent to the release from Jones to Sperry, the case not stating that Jones was indebted to any person prior to the 3d of November, 1815, when his first bond to Holland bears date, which was nearly twelve months subsequent to this release. The question then is, whether, as a subsequent creditor, the lessor of the plaintiff comes within the operation of the statute of 13 Eliz. I have attentively considered the numerous cases which relate to this subject, and with entire satisfaction to myself, I have come to the following result: A voluntary deed by a person indebted at the time, to any amount, is fraudulent and void as to such prior creditors, merely upon the ground that he was so indebted. But as to subsequent creditors, the deed is not void for that reason, because it does not necessarily, nor even rationally, follow, that the conveyance was fraudulently made with intent to hinder or delay creditors, who became such long after the deed was made. But if the case presents other circumstances from which fraud can legally be inferred, the voluntary conveyance will be avoided in favour of a subsequent creditor. Thus, if the grantor, in a voluntary deed, incurs debts immediately, or so soon afterwards as to warrant a presumption that the deed was made in contemplation of such future indebtedness; it would be difficult to protect such a deed against the charge of fraud. So, if the grantor, at the time the deed was made, was indebted to the extent of insolvency, or perhaps of great embarrassment, so as to create a reasonable presumption of a fraudulent design, the deed may be impeached even by a subsequent creditor, unless the presumption is repelled by showing that such prior debts were secured by mortgage, or by a provision in their favour in the deed itself. But the proof of such prior debts rests upon the party who attempts to avoid the deed, upon the ground of a subsequent indebtedness. The most prominent cases upon this subject are, Walker v. Burrows, 1 Atk. 93; Stephens v. Olive, 2 Brown, Ch. 92; Lush v. Wilkinson, 5 Ves. 387; Kidney v. Coussmaker, 12 Ves. 155; Montague v. Lord Sandwich, in a note to the preceding case; Holloway v. Millard, 1 Madd. Ch. 414; Bennet v. Bedford Bank, 11 Mass. 421; and 3 Johns. Ch. 371.

The law being thus settled, as it appears to me, it is conclusive of the present case. The lessor of the plaintiff appears before the court in the character of a subsequent creditor, and as representing Holland, under whose judgment and execution he purchased. The case does not state, nor can the court presume, that Jones was indebted to the amount of a single dollar at the time when he released to Sperry; nor is there a circumstance stated in the case from which the court can legally infer a fraudulent intent in the releasor. The deed then was not void as it respected Holland, and consequently it cannot be so considered as to the purchaser under his execution, who cannot be in a worse situation than Holland, whom he represents. The deed being valid in respect to Holland, the sheriff had no authority under his execution to levy on, and sell, land legally belonging to Ogden, Rowland, and Segur, and then in the possession of their tenant. I make no particular remarks upon the release to Howell, because, if that to Sperry was valid, Jones had nothing remaining in him which he could pass to Howell: and because, if this were not so, still it appears that Jones was largely indebted, and that to Holland, at the time when this release was executed. The court was much pressed by the plaintiff's counsel to connect the release to Sperry with the original transaction, so as to infect it with the taint of a lottery consideration. But to do this would be to carry the doctrine of presumption to a dangerous length. There are no facts stated in the case which can warrant the court in saying that the release was made in pursuance of the lottery. As a private individual, I might suspect that this was the case; but as a judge, I dare not affirm it to be so, nor can I permit myself to substitute suspicion for fact, and to decide as if it were really so.

I am then of opinion upon this case, that the law is in favour of the defendant; and that judgment should be entered, as in case of nonsuit, in conformity with the agreement of the parties.

[For a similar action by the same plaintiff against John Ogden, Jr., see Case No. 11,814.]